NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

LUIS ALVAREZ, JR.,

    Plaintiff,

 v.

COMMISSIONER OF
SOCIAL SECURITY,

    Defendant.

Civil Action No. 10-CV-2653 (SDW)

OPINION

June 27, 2011

**Wigenton**, District Judge,

  Before the Court is plaintiff Luis Guillermo Alvarez, Jr.'s ("Plaintiff") appeal of the decision of the Commissioner of the Social Security Administration ("Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") pursuant to Sections 216(i) and 223(d), and supplemental security income ("SSI") under Section 1614(a)(3)(A) of the Social Security Act (the "Act").  *See* 42 U.S.C. §§ 416(i), 423(d) and 1382c(a)(3)(A).

  This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78.  The Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Venue is proper under 28 U.S.C. § 1391(b).

  For the reasons set forth below, this Court REMANDS the Commissioner's decision.

**FACTUAL AND PROCEDURAL BACKGROUND**

  Plaintiff was born on September 18, 1951.  (Admin. R. Ex. 1D, at 1.)  He was fifty-seven years old at the time of his hearing before Administrative Law Judge Richard West ("ALJ"). (Luis Alvarez Hr'g July 14, 2009 Tr. (hereafter "Tr.") 5.)  Plaintiff graduated from high school

and completed some college; however, he did not receive a college degree. (Tr. 5.) On December 7, 2006, Plaintiff filed for DIB and SSI. (ALJ's Decision at 1.) Plaintiff claimed disability due to severe depression, severe panic and anxiety attacks, asthma, stomach problems, leg and thigh pain, high cholesterol and anemia. (Admin. R. Ex. 3E, at 1.) He alleged that his disability began on February 25, 2004. (*Id.* at 2.) Plaintiff's applications were initially denied on June 20, 2007, and then denied again after reconsideration on March 11, 2008. (ALJ's Decision at 1.) Plaintiff requested a hearing, and the hearing was held on July 14, 2009 before the ALJ. (*Id.*) The ALJ's decision dated July 23, 2009 ("ALJ's Decision") was unfavorable. On April 30, 2010, the Appeals Council denied Plaintiff's request for review. On May 24, 2010, Plaintiff commenced this matter to appeal before this Court. (*Id.*)

   A. *Medical History*

Plaintiff began treatment for depression in the early to mid 1970s. (*See* Tr. 10.) In December 1999, Plaintiff began treatment with a psychiatrist, Dr. David Corwin ("Dr. Corwin"), for panic attacks, anxiety and depression. (Admin. R. Ex. 1E, at 9.) Dr. Corwin treated Plaintiff with medication and counseling until December 2006. (*See generally* Admin. R. Ex. 1E.) Plaintiff testified that he stopped working in 2004 because of depression and started seeing Dr. Jesus Alfredo Pena ("Dr. Pena"). (Tr. 10.)

Plaintiff testified that he had a long history of depression, and began psychiatric treatment thirty years earlier, but his symptoms worsened around 2004. (Tr. 10.) Subsequently, Plaintiff began seeing Dr. Pena every two months for treatment and to adjust his medication. (*Id.* at 12, 29.) He also saw another unidentified therapist twice a week. (*Id.* at 12-13.) Dr. Pena treated Plaintiff with "[m]edications for depression and anxiety attacks, panic attacks and therapy." (*Id.* at 12.) Plaintiff went to Trinitas Medical Center for treatment twice a month and saw a church

family therapist twice a week. *(Id.* at 12-13)

Plaintiff testified that due to his depression, he lost 70 pounds. (*Id.* at 15.) Plaintiff claimed that in 2004, his drinking, panic attacks, and depression increased due to his wife's birth of a stillborn baby.[1] (Tr. 9.) Prior to his relapse in 2004, Plaintiff had been sober for approximately seventeen years and was in Alcoholics Anonymous. (*Id.* at 17.) At the time of his hearing in 2009, Plaintiff had been sober since March 2006. (*Id.*)

On October 14, 2004, Plaintiff had a vascular test performed at Trinitas Hospital. (Admin. R. Ex. 7F, at 12.) The doctor's impressions indicated that he could have a mild arteriosclerotic vascular disease, but it did not appear to be significant. (*Id.*) On October 31, 2006, Plaintiff complained of knee and hip pain, as well as difficulty breathing. (*Id.* at 7-8.) Plaintiff's right knee and hip were x-rayed at Trinitas Diagnostic Imaging. (*Id.* at 7.) His knee x-ray showed mild degenerative changes, but it was otherwise a normal study. (*Id.*) The study of Plaintiff's hip was unremarkable. (*Id.*) Plaintiff's chest x-ray also showed mildly prominent interstitial markings, which may have been chronic; however, there were no acute infiltrates found. (*Id.* at 8.)

In addition to his panic attacks and depression, Plaintiff testified that he is only able to walk "a few steps" at a time because of numbness in his legs and clogged arteries. (Tr. 19.) Plaintiff claimed that these problems limit his ability to lift and carry heavy objects and he can now lift only "a couple of pounds." (*Id.*) Plaintiff also reported having a history of high cholesterol, high blood pressure, and gastritis. (Admin. R. Ex. 2F, at 4.) Furthermore, Plaintiff

---

[1] The Court notes that although Plaintiff alleges his disability began in 2004 due to his wife's failed pregnancy, the record appears to contradict Plaintiff regarding the sequence of events. (*See* Tr. 9-11; Admin. R. Ex. 2D at 2; *Id.* Ex. 1E at 9.) In his application for SSI, Plaintiff states that his first marriage ended in death in 1997 and his second marriage in divorce in 2000, there is no mention of a still birth from either marriage. (*See* Admin. R. Ex. 2D at 2.) In a document provided by Dr. Corwin, Plaintiff's first wife is reported to have had two failed pregnancies before she died in 1997. (Admin. R. Ex. 1E, at 9.) The ALJ's determination of credibility and final findings may have been impacted by such disparities, but it is not specifically addressed in the ALJ's Decision.

stated that he has difficulty concentrating and remembering, which are "side effects from the medications." (Tr. 23.) At the time of the ALJ hearing, Plaintiff was taking various prescription medications such as Klonopin, Cyto, Wellbutrin, Citalopram, Advair and a nitro inhaler. (*Id.* at 29-30.) Plaintiff also testified that he has panic attacks "[a] couple of times a week" and that it takes about an hour to recover from each attack. (*Id.* at 25.)

On March 3, 2006, Dr. Ernesto Perdomo ("Dr. Perdomo"), a licensed psychologist, evaluated Plaintiff's psychological state. (Admin. R. Ex. 2F, at 4.) Dr. Perdomo assessed that Plaintiff's "depression and panic attacks may affect his ability to function effectively at any job." (*Id.*) Furthermore, Dr. Perdomo's diagnosis indicated that Plaintiff's "[p]sychosocial stressors appear to be severe due to homelessness, living in the YMCA, recurrent depression, and panic attacks." (*Id.*) Dr. Corwin indicated that when he last saw Plaintiff, "he was depressed, disorganized with racing thoughts, and was quite distractible, with rambling speech which was not always coherent" and "[h]e has been frequently depressed and disorganized with panic states." (Admin. R. Ex. 1F, at 1.) In December 2006, Dr. Corwin stopped seeing Plaintiff because he closed his office. (*Id.*)

A June 15, 2007 Orthopedic Consultative Examination report by Dr. Allen Glushakow ("Dr. Glushakow"), a non-treating physician, indicated that Plaintiff was hospitalized in 1995 for his psychiatric treatment. (Admin. R. Ex. 5F, at 1.) Dr. Glushakow also stated that Plaintiff received treatment for twenty-five years, and at the time of the hearing was receiving psychiatric treatment at Trinitas Hospital. (*Id.*) He noted that Plaintiff had a history of asthma, but that he had full range of motion in his neck, shoulders, elbows, wrists, and back. (*Id.*) Further, Plaintiff had no atrophy in his upper or lower extremities, he was able to squat, walk on his toes, and heels and his gait was within normal limits. (*Id.*) There were no focal findings in Plaintiff's

4

neurological field and there was no evidence of any orthopedic problems at the time. (*Id.* at 2.) Dr. Glushakow did note that Plaintiff suffers from depression. (*Id.*)

On November 1, 2006, Plaintiff's pelvis and abdomen were examined after he complained of abdominal pain, accompanied by weight loss. (Admin. R. Ex. 7F, at 6.) The tests of Plaintiff's liver, spleen, pancreas and abdominal loops showed no significant findings. (*Id.*) On June 22, 2007, Plaintiff's medical report revealed Plaintiff's "heart size and pulmonary vascularity to be normal", his lung fields were "free of infiltrate or other acute finding[s]", and that "the costophernic angles [were] sharp." (Admin. R. Ex. 7F, at 2.) Further, a pulmonary function test done on June 26, 2007 indicated that Plaintiff's dynamic and static lung volumes were normal, but there was a mild diffusion defect. (*Id.* at 3.)

In 2009, Plaintiff had three radiology examinations. (*See generally* Admin. R. Ex. 16F.) The first exam took place on April 1, 2009. (*Id.* at 1.) The doctor found "no evidence of abdominal aortic aneurysm or dissection…moderate diffuse atherosclerotic changes… [and] no evidence of periaortic collection." (*Id.*) The second took place on April 9, 2009. (*Id.* at 2.) The doctor found that both renal arteries appeared patent, but the "[p]roximal inferior mesenteric artery appeared to be occluded" and "the inferior mesenteric artery was reconstituted via retrograde flow from the middle rectal artery . . . [to] provide [] flow to the left colon[.]" (*Id.*) On April 27, 2008, Dr. Jung-Tsung Tsai noted that Plaintiff could elect to have surgery, but did not require him to do so. (*Id.* at 3.) The third exam occurred on May 8, 2009. (Admin. R. Ex. 16F, at 5.) This test showed that Plaintiff's lungs were "aerated and clear," and there was no pneumothorax, pleural effusion or consolidation. (*Id.*) His cardiomedicastinal silhouette was normal in size and configuration, and the soft tissues and osseous structures were otherwise unremarkable. (*Id.*) A lab test from July 9, 2009 showed that Plaintiff had no active pulmonary

5

disease.  (*Id.* at 4.)

Additionally, Plaintiff testified that after a double bypass surgery in 2009, he began taking Plavix, Lipitor, and aspirin.  (Tr. at 16, 32-33.)  Plaintiff stated that he might need another surgery on the arteries in his legs.  (*Id.* at 33.)

### B. *Plaintiff's Employment History*

Plaintiff testified that his last employment ended in 2004, five years prior to his hearing.  (Tr. 7.)  Plaintiff was employed as a chemical mixer from 1997 until 2004.  (*Id.* at 6-7.)  His duties included mixing raw materials and entailed standing, lifting drums, and bags of raw materials weighing over fifty pounds on a daily basis.  (*Id*. at 6-7.)  Prior to that Plaintiff worked as a stationary engineer from 1977 to 1995.  (*Id.* at 7-8; Admin. R. Ex. 3E, at 3.)  His responsibilities included measuring iron for the boiler and "basically [running] the boiler and the chemical plant."  (Admin. R. Ex. 3E, at 3; Tr. 8.)  Plaintiff wrote reports, stood, walked, and climbed up ladders to check the gauges on a daily basis.  (Tr. 8-9.)

The ALJ's Decision states that Plaintiff was laid off in 2002 due to his alcohol-related problems, but an April 2007 record provides that he "[lost] job due to his alcohol problem 4 yrs ago [2003]."  (ALJ's Decision at 5; Admin R. Ex. 9F)

### C. *Vocational Expert's Testimony*

In addition to Plaintiff's testimony, the ALJ also heard testimony from vocational expert Rocco Meola ("Meola").  (*See generally* Tr. 34-43)  The ALJ presented a hypothetical and asked Meola for an assessment of vocational capabilities.  (Tr. 35.)  Meola was asked to assume that the claimant was capable of performing medium work, limited to four-step directions,  "[with] occasional contact with the general public . . . [and] avoid[ed] concentrated exposure to dust, fumes and similar occupational irritants, [as well as] concentrated exposure to wetness and []

humidity." (*Id.*) Meola responded that Plaintiff would be able to find jobs as a bagger, wrapper, assembler, packager, or stapling machine operator. (*Id.*)

Plaintiff's attorney then posed a different hypothetical to Meola, asking whether a claimant also suffering from panic attacks that lasted between forty-five minutes to an hour and fifteen minutes would be able to work effectively. (*Id.* at 37-43.) Meola testified that if a panic attack "came other than break time . . . even one a week [it] would have a negative impact on [that claimant's] ability to function." (*Id.* at 41.) Subsequently, Plaintiff's attorney asked additional follow up questions regarding the impact of panic attacks based on frequency and duration. (Tr. 43.)

## STANDARD OF REVIEW

In social security appeals, this Court has plenary review of the legal issues decided by the Commissioner. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). Yet, this Court's review of the ALJ's factual findings is limited to determining whether there is substantial evidence to support those conclusions. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotations omitted).

Substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla;' it is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bailey v. Comm'r of Soc. Sec.*, 354 Fed. Appx. 613, 616 (3d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Importantly, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'" *Bailey*, 354 Fed. Appx. at 616 (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

However, if the factual record is adequately developed, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Daniels v. Astrue*, No. 4:08-cv-1676, 2009 WL 1011587, at *2 (M.D. Pa. Apr. 15, 2009) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). "The ALJ's decision may not be set aside merely because we would have reached a different decision." *Cruz v. Comm'r of Soc. Sec.*, 244 Fed. Appx. 475, 479 (3d Cir. 2007) (citing *Hartranft*, 181 F.3d at 360). The court is required to give substantial weight and deference to the ALJ's findings. *Scott v. Astrue*, 297 Fed. Appx. 126, 128 (3d Cir. 2008). Nonetheless, "where there is conflicting evidence, the ALJ must explain which evidence he accepts and which he rejects, and the reasons for that determination." *Cruz*, 244 Fed. Appx. at 479 (citing *Hargenrader v. Califano*, 575 F.2d 434, 437 (3d Cir. 1978)).

In considering an appeal from a denial of benefits, remand is appropriate "where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) (quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D.Pa. 1976)). Indeed, a decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984).

## **DISCUSSION**

An individual is disabled under the Social Security Act "only if [his or] her physical or mental impairment or impairments are of such severity that [he or] she is not only unable to do [his or] her previous work but cannot, considering [his or] her age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy." *Burnett v. Comm'r of Social Sec. Admin.*, 220 F.3d 112, 118 (3d Cir. 2000) (internal quotations omitted) (quoting *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999); 42 U.S.C. § 423(d)(2)(A). If an individual cannot perform past work or any other work in the national economy, then the individual is considered unable to engage in "substantial gainful activity." *See Burnett*, 220 F.3d at 118.

Subjective complaints of pain, alone, cannot establish disability; however, subjective testimony by the individual that is consistent with "objective medical evidence" must be considered by the ALJ. 42 U.S.C. § 423(d)(5)(A). An individual must prove the "medical signs and findings" related to her ailment have been "established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged . . . ." *Id.*

In order to determine if an applicant is entitled to Social Security disability benefits, a five-step sequential analysis is applied by the ALJ to determine disability. *Cruz v. Comm'r of Soc. Sec.*, 244 Fed. Appx. 475 at 480 (citing 20 C.F.R. §§ 404.1520 (a)(4)(i)-(v)). "A negative conclusion at steps one, two, four or five precludes a finding of disability." *Id.* However, "[a]n affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability." *Id.* (citing §§ 20 C.F.R. 404.1520 (a)(4)(i)-(v)).

> The United States Supreme Court describes the evaluation process as follows:
>
> The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments

> presumed severe enough to preclude any gainful work. If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits.

*Sullivan v. Zebley*, 493 U.S. 521, 525-26 (1990); *see also* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v).

The burden of persuasion lies with the claimant in the first four steps. *Malloy v. Comm'r of Soc. Sec.*, 306 Fed. Appx. 761, 763 (3d Cir. 2009). At step five the burden shifts to the Commissioner to show that the claimant can perform "other work." *See Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002). The ALJ must show that the claimant has the requisite residual functional capacity ("RFC") to perform other work, not previously performed by claimant, but still existing in large number in the national economy. *See id*. A district court may vacate and remand the ALJ's decision if the ALJ rejects relevant medical evidence and fails to afford an explanation as to why he did so. *See Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981); *see generally Kennedy v. Richardson*, 454 F.2d 376 (3d Cir. 1972).

**Steps One and Two**

At step one the ALJ must determine whether the Plaintiff is, at the time of filing, engaging in "substantial gainful activity." 20 C.F.R. § 416.920(a)(4)(i). Substantial gainful activity is work that involves significant physical or mental activities and is done for pay or profit. 20 C.F.R. § 416.972(a)-(b). Here, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since 2004. (*See generally* ALJ's Decision.)

Under step two, the question is whether claimant has an impairment that significantly affects his ability to work. *See* 20 C.F.R. § 416.920(c). In the instant matter, the ALJ found that Plaintiff suffered from depression, anxiety attacks, panic attacks, alcoholism in remission,

10

hypertension, hyperlipidemia and asthma.[2] (ALJ's Decision at 3.) These impairments were "evidenced by psychiatric records[,] a psychological consultative examination report[,] and hospital records." (*Id.*)

**Step Three**

At step three, the ALJ is required to "compare the claimant's medical evidence to a list of impairments presumed severe enough to preclude any gainful work." *Caruso v. Comm'r of Soc. Sec.*, 99 Fed. Appx. 376, 379 (N.J. 2004). In the *Burnett* case, the Third Circuit required the ALJ to "fully develop the record and explain his findings at step three," and to explain why all of claimant's impairments when combined do not meet or equal the listed impairments. *See* 220 F.3d at 120. *Burnett* "does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." *Padilla v. Comm'r of Soc. Sec.*, No. 09-2897, 2010 WL 2346650, at *5 (D.N.J. June 9, 2010) (citing *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)). Instead, the Third Circuit advises district courts to consider the ALJ's decision in its entirety to determine whether the ALJ considered all relevant factors at step three. *Id.*

In the instant matter, the ALJ found that Plaintiff did not meet the description of Listing Section 3.03 for Asthma "because he does not suffer from chronic asthmatic bronchitis or [asthma] attacks, in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year." (ALJ's Decision at 4.) The ALJ also found that Plaintiff did not meet the standards of Listings 12.04, for Affective Disorder; 12.06 for Anxiety-Related Disorders; or 12.09, for Substance Addiction Disorders. (ALJ's Decision at 4.) The ALJ stated that "the record does not establish that [Plaintiff's impairment] has resulted in at least two of the following 'B' criteria: marked restriction of activities of daily living; or

---

[2] Plaintiff argues that the ALJ failed to take into account his heart disease and vascular disease. (Admin. R. Ex. 16F at 3; Pl.'s Br. 22.) Yet, when filling out his disability report for benefits, Plaintiff did not mention heart disease or vascular disease as conditions that limit his ability to work. (Admin. R. Ex. 3E, at 1); s*ee* 42 U.S.C. § 423(d)(1)(A).

11

marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (*Id.*)

The ALJ's Decision stated that Plaintiff has only moderate restrictions on his daily living and with concentration as he can "carry out a simple four-step instruction, he is unable to give a serial seven and [Plaintiff] testified that he has to write everything down because he has trouble concentrating and remembering." (*Id.*) Further, the ALJ stated that Plaintiff "experienced no medically identifiable episode of decompensation for an extended duration," and thus concluded that Paragraph B of section 12.09 was not satisfied. (*Id.*)

**Steps Four and Five**

If there is not substantial evidence to find Plaintiff disabled under one of the medical impairments, the ALJ continues the analysis to determine whether Plaintiff can perform his past employment based on his RFC. 20 C.F.R. § 416.920(e). The RFC looks at all of the relevant medical and other evidence in the case record and measures what work, if any, Plaintiff is able to perform based on his mental and physical limitations. *Id*; 20 C.F.R. § 416.920(a)(4)(ii).

The ALJ noted that Plaintiff has:

> ….the residual functional capacity *to perform less than the full range of medium work* with the following non-exertional limitations: he cannot perform work requiring more than the ability to understand and follow four-step instructions; with more than occasional contact with the general public; and with concentrated exposure to dust, fumes, other occupational irritants, wetness and humidity (20 C.F.R. 404.1567 and 416.920(c).[)] (ALJ's Decision at 4.)(emphasis added).

As a result, the ALJ properly sought testimony from a vocational expert. (*Id.* at 8.) Social Security Regulations provide, "a vocational expert or specialist may offer expert testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the

claimant's previous work." *Russo v. Astrue*, No. 10-2772, 2011 WL 1289132, at *6 (3d Cir. 2011). In posing a hypothetical question, the ALJ must "accurately convey to the vocational expert *all of a claimant's credibly established limitations*." *Id.*; *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005)(emphasis added).

In the instant matter, the ALJ did not have to rely on the hypothetical that Plaintiff's attorney posed to the vocational expert, but he did have to present appropriate background information when he gave his own hypothetical. Much of the ALJ's questioning of the vocational expert was with regard to a medium exertional level and moderate restrictions, not Plaintiff's panic attacks and mental impairments. *See Cotter*, 642 F.2d at 705. The ALJ asked the vocational expert to assume that the claimant is 57 years old with a high school education, capable of performing at a medium exertional level, and able to follow up to four step directions. (Tr. 35.) The ALJ also asked the vocational expert to assume that the individual is limited to occasional contact with the general public, and must avoid concentrated exposure to irritants. (*Id.*) However, the ALJ's hypothetical did not include that the individual suffers from depression, panic attacks, anxiety, constant sadness, and had alcohol dependency issues. (*Id.*; ALJ Decision at 4). In response to a hypothetical posed by Plaintiff's attorney regarding panic attacks lasting "45 minutes, an hour, an hour and fifteen," the vocational expert noted that the panic attacks, happening even once a week, but not coinciding with a break, would be "unacceptable" and "have a negative impact on his ability to function." (Tr. 40-41.)

As stated by the Third Circuit in *Cotter* "an [ALJ's] findings should be as comprehensive and analytical as feasible and [] should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision." *Cotter* 642 F.2d at 705. The ALJ clearly evaluated evidence regarding Plaintiff's

13

physical impairments. There is evidence in the record to support Plaintiff's assertion that he possesses medically determinable mental impairments, but it is unclear if the ALJ considered all of this evidence and the weight given. While the ALJ mentions Plaintiff's mental health evaluations and Plaintiff's issues with depression generally, the ALJ does not specifically address much of the evidence regarding Plaintiff's claims of panic attacks, their frequency or effect on Plaintiff's ability to work.

Further, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (ALJ's Decision at 6.) The ALJ concluded that Plaintiff is not able to do the same work he did prior to his alleged disability, but that he could engage in other work. (*Id.* at 7-8.) The ALJ noted that Plaintiff suffers from anxiety, alcohol dependency in remission, consistent sadness, panic attacks, and stopped eating and lost 70 pounds due to depression, but the ALJ did not explain why he disregarded evidence and testimony regarding severity. (*Id.* at 4-5.) The ALJ did not provide a clear explanation for why Plaintiff's recognized mental impairments, including panic attacks, are not substantial enough to prevent Plaintiff from engaging in other work. (*See generally* ALJ Decision.) The ALJ's Decision is unclear as to which evidence he relied upon and which evidence he did not find to be credible, thus clarification is need.

"Regulations require that, in addition to activities of daily living, an ALJ [must] also consider social functioning, concentration, persistence or pace, and episodes of decompensation when assessing a claimant's impairments." *Russo*, 2011 WL 1289132, at *4. At step five, the ALJ must show that the claimant has the requisite RFC to perform other work, not previously

performed by claimant, but still existing in large number in the national economy. *Burns*, 312 F.3d at 119. At this stage it is important for the ALJ to note how the claimant's impairments might limit his ability to perform different tasks and responsibilities. *See* 20 CFR § 416.920.

The ALJ found that Plaintiff was able to perform work at a medium exertional level. (*See* Tr. 35; ALJ's Decision at 6.) The ALJ's Decision includes a discussion of the following assessments: a psychiatric evaluation of Plaintiff performed on March 3, 2007; a mental health assessment on April 30, 2007 where Plaintiff was given a Global Assessment of Functioning ("GAF") score of 55; and a psychiatric evaluation from May 14, 2007, which states that he had a GAF score of 50. (*See generally* Admin. R. Ex. 9F and 2F.) The ALJ Decision highlighted the fact that Plaintiff had a clean appearance at his March 3, 2007 psychiatric evaluation, and that he spoke coherently. (ALJ Decision at 6.) The ALJ also noted that Plaintiff had full impulse control, full frustration tolerance, and was well oriented to time, place, and person. (*Id.*) However, the ALJ's Decision did not discuss or address the degradation in Plaintiff's mental stability from April 30, 2007 to May 14, 2007, particularly regarding decline in GAF score. (*See id.*) The ALJ also did not address Plaintiff's testimony of having lost weight specifically due to depression and it is unclear if the ALJ disregarded Plaintiff's Functional Capacity Assessment, which stated that Plaintiff's ability to understand, remember, and carry out detailed instruction was "markedly limited." (Tr. at 19-20, 39-43; Admin. R. Ex. 4F, at 1; 9F at 6.)

Additionally, the ALJ did not explain how the fact that Plaintiff could only follow four-step instructions, had only fair short-term memory *and panic attacks* would affect his ability to do any new job. (*See id.*) Further explanation is needed to show how the ALJ decided that Plaintiff did not have sufficient medically determinable mental impairments, including a discussion of the impact of Plaintiff's panic attacks.

    Considering the record as a whole and the testimony provided by the vocational expert, the ALJ should clarify his treatment of the relevant evidence and factors, particularly with regard to Plaintiff's panic attacks and mental impairments.

## **CONCLUSION**

    For the foregoing reasons, the ALJ's Decision is REMANDED for clarification and more developed findings. The ALJ should provide further explanation of the items in the record that are relied upon in his decision.

                                                                                                s/ Susan D. Wigenton, U.S.D.J.

Orig:        Clerk
cc:          Judge Arleo
             Parties